THE STATE v. VAN HIGGINBOTHAM, Appellant.—72 S. W. (2d) 65.

Division Two, May 17, 1934.

*Collins & Pierce* and *Everett Frieze* for appellant.

*Roy McKittrick,* Attorney-General, and *Frank W. Hayes,* Assistant Attorney-General, for respondent.

ELLISON, P. J.—The defendant was convicted of rape in the Circuit Court of Polk County and his punishment assessed by the jury at imprisonment in the State penitentiary for fifteen years. He appeals complaining of the admission of incompetent and prejudicial evidence; of the refusal of certain instructions; of improper cross-examination of his wife by the assistant circuit attorney; and that the verdict was against the evidence and the result of passion and prejudice. The defense was an alibi.

The prosecuting witness, Althea Eidson, a widow thirty-seven years old, lived in the country in Polk County with her son, a boy eight years old. She testified that on the night of September 24, 1932, she retired about nine o'clock. Thereafter, sometime before midnight she was awakened by a low voice outside the house calling her by her first name. She thought something was wrong and asked what was wanted. The person answered: "You are wanted on the 'phone." Though uneasy and in doubt she went to the door. Through the glass she could see a man outside. He drew a revolver and threatened to blow up the house and to kill her if she didn't open the door, or if she screamed. She awakened her young son and the two in their night clothes went out of a door on the other side of the house. She directed the boy to run to the home of her brother-in-law and nearest neighbor, Floyd McKinney. She started in the opposite direction to another neighbor's, Charley Craig. She had got only a little distance when the man who had been at the door overtook her and threatened her with his revolver if she didn't stop and obey him or if she screamed.

The man's car was parked there and he ordered her to get in it. She didn't, and he put both arms around her and held her. They were face to face and she recognized the man as the defendant, Van Higginbotham. He lived some eight or nine miles south. He had drilled a well on her place about two years before. She hadn't known him prior to that time, and didn't say she had ever seen him afterward until the night of the ravishment. But she declared on the witness stand: "I recognized that man as the man that drilled my well, Van Higginbotham, just as plain as I can see him here; there is no doubt, when he did that, for I knew him right then." Also, in the course of a searching cross-examination covering thirty-seven pages of the record she asserted she was positive the man was the defendant. In answer to one question she declared "Yes, sir, I know it." And

she described his clothing, saying he had on a pair of overalls, a dark coat and a felt hat.

Getting back to Mrs. Eidson's account of the ravishment, she said while the appellant was holding her she reached around for the revolver, which he had put in his hip pocket, but he thwarted her, seized the weapon and pressed it against her face. He forced her back into the house yard and was about to compel her to submit to him there when the lights of a car on the highway flashed on their faces. He then made her go around behind the house to a back porch where he overpowered her, causing her to fall and strike her head in such manner that she was stunned for a time. He held her down, striking her on the chest and abdomen, and accomplished his purpose, having sexual intercourse with her. Just about that time a car drove up in front of the house and someone called her several times. She broke away from the appellant, answered the persons in front saying, "What," and ran around to where they were. They proved to be her young son, her brother-in-law Floyd McKinney and her neighbors Charley Craig and Mrs. Craig. She was helped into the car and the defendant came running out to the fence, displaying his revolver. He said "Now, you drive, and I mean drive"—and they did, going to the home of another neighbor, Tom Robinson.

This testimony was corroborated in part by Mr. McKinney and Mr. and Mrs. Craig. McKinney said he was called by his wife during the night and went out into his yard where he heard Mrs. Eidson's little boy crying as he ran up the road. The boy said "someone is killing mother." McKinney put the lad in his car and drove past the Eidson house to the Craig home where he aroused Mr. and Mrs. Craig and they all drove back to the Eidson home. Mr. Craig hollooed several times and Mrs. Eidson finally answered and came around the side of the house to where they were. In response to their inquiries as to what was the matter she said "he raped me." She said it was "a" Higginbotham—she couldn't remember his first name, but it was the one who had dug her well. Mr. Craig helped her into the car. About that time a man came running out from the house to the fence. He said "You drive, and I mean drive." He had something in his hands that looked like a revolver. Mr. McKinney said he recognized the man as the defendant. Mr. and Mrs. Craig substantiated that part of the foregoing which occurred after they had joined Mr. McKinney, except that they did not recognize the man. They both knew the defendant; he had boarded at their house while he was boring Mrs. Eidson's well. But Mrs. Craig couldn't tell who the man was and Mr. Craig said he was on the opposite side of the automobile when the man came running up.

About the time Mrs. Eidson got in the car somebody suggested that they get the license number of the automobile of her assailant, which

stood parked there. It was a Ford coupe, Model A, with a turtle-back or closed lid in the rear. Both the men and Mrs. Eidson looked at the license number in the rear. It was bent at one end or corner and covered with mud. Also one or two of them noticed a sticker in the back window and some kind of an emblem attached to the license plate. They were unable to get the license number because the man who came out with the revolver drove them off before they had done so.

On their arrival at the Robinson home Mr. Shipley, sheriff of Polk County, was called. He met Mr. McKinney at the village of Half Way which was close to where the parties lived. From there they drove immediately to Buffalo, the county seat of Dallas County and conferred with the sheriff of that county. (Buffalo is about ten miles east of Half Way and the Dallas County line is about half that distance.) Sheriff Shipley said they made this trip because someone at the Robinson house had telephoned the Dallas County sheriff and they wanted to see "whether he had caught the party or not." Two of the neighbors had observed a Ford coupe come from the direction of the Eidson home and drive rapidly east to No 54 highway which led to Buffalo. Finding nothing at Buffalo, Messrs. Shipley and McKinney returned to the Robinson home where Mrs. Eidson was, and then, for the first time, the sheriff talked to her.

She told him about the assault and accused the appellant but said "I would like to see him, to make sure." The sheriff, McKinney, Charles Craig and Andy Robinson drove to the appellant's home and called him out. It was then about one A. M. They informed appellant of the accusation made against him by Mrs. Eidson and asked him if he would drive over to the Robinson home and face her. He consented and with his wife in his automobile followed the sheriff's car back to the Robinson's. There Mrs. Eidson, who was in bed, felt his clothes, hair and face, and asked him to repeat certain words and sentences which she said the man who assaulted her had used. The clothing he was wearing in general corresponded with that Mrs. Eidson described as having been worn by her assailant. She said "That is the man; it sounds exactly like his voice." Then she asked to look at the appellant's automobile. She was taken outside and from the bent license plate and the make and model of the car she identified it as the one that had been parked in front of her house. Mr. McKinney also said it was the same car. In addition to the bent license plate he noticed a sticker pasted on the widow over the back of the seat and an emblem attached to the license plate, the same as he had seen on the car parked in front of Mrs. Eidson's home. Mr. Craig observed the bent license plate on the car both occasions. The appellant explained to them he had bent the license plate at his home that night when he turned the car around to follow the sheriff to

Mr. Robinson's home. And later, at the trial, the appellant and his wife both testified the plate had been bent in that manner and at that time—in other words, *after* the Ford coupe was seen at Mrs. Eidson's with a bent license plate. They admitted Mrs. Eidson did, as she testified, go out of the Robinson house to look at the appellant's car and that she called attention to the bent license plate, but they swore she had not said anything about the plate's being bent until after she saw it in that condition.

Furthermore, at the Robinson place Mr. Craig and others took note of the tires on the appellant's car. They were "Corduroy Cords," a kind commonly used in that neighborhood. The right front tire was practically new, and the left one worn smooth. The two rear tires were about half worn, though one was in a little better shape than the other. The sheriff, McKinney and Craig went back over to the Eidson house and examined the prints made in the dirt road by the Ford car they had seen parked there. The tracks corresponded with the tires on the appellant's car, and they followed them as far as the graveled Highway 54, where they were no longer clearly discernible. They did not, however, compare these tracks with prints actually known to have been made by the appellant's car, nor did they go down to his home and look for tracks. After all this the sheriff let the appellant and his wife go back to their home on appellant's promise that if a complaint should be filed against him he would be on hand to answer it.

Since substantial proof was adduced by both the State and the defense and we do not weigh the evidence on appeal, we shall not review at any length the showing made by the appellant; but for a better understanding of the case an outline thereof will be given. The appellant proved by five or more witnesses who saw him at one time or another between four o'clock in the afternoon and eight o'clock in the evening the day of the assault, that he was wearing overalls and a blue jacket or jumper with the suspenders or straps of the overalls outside of the jumper. He and his wife and daughter said the same. (It will be recalled Mrs. Eidson testified the man who assaulted her had a coat on.) And he and his wife and a number of other witnesses said he had a coil of drill rope in the back compartment of his Ford coupe which pushed open the lid ten or twelve inches. In particular, one witness named Ray Vickery who had worked for the appellant up to that week, said he went to the appellant's home about ten o'clock that Saturday night to get some tools he had left with the appellant. The appellant came to the door in his night clothes and told the witness the tools were in the back of his car, which was standing in the yard. The witness went to the car and had to throw out the large coil of rope to get the tools. All this evidence was offered to oppose that introduced by the State showing the back

lid of the Ford coupe standing in front of Mrs. Eidson's home was closed, or down.

The foregoing testimony of the witness Vickery also substantiated the appellant's alibi. On that point his wife and their twelve year old daughter swore he got home that night about nine o'clock. Their clock had stopped but the little girl said she had retired at the usual time, between eight and nine o'clock, and that she had not gone to sleep when her father arrived. Mrs. Higginbotham said she "took it to be about nine o'clock." She had retired. The appellant said his watch was broken, but that he thought he reached his home about 9:30. Both the appellant and his wife told of the witness Vickery's coming to the house thereafter.

I. As stated, during the direct examination of the appellant's wife she testified that her husband came in about nine o'clock. On cross-examination she was asked if she had not stated when the sheriff and Messrs. McKinney, Craig and Robinson were there later that night that the appellant got home about eleven o'clock. She denied it. She was then asked if on the same occasion she had not said to her husband: "Now, Van, if you had been at home where you ought to have been I would know you were innocent." She denied saying that. This line of inquiry was pursued for several questions and the witness was excused, all without objection from the appellant. After Mrs. Higginbotham had left the stand and the next witness had been called, appellant's counsel asked the court to withdraw from the consideration of the jury "the testimony of the defendant's wife wherein she testified that she didn't say 'Now, Van, if you had been at home I would have known you were innocent,' because the same was not traversed in her examination in chief, and was for the purpose of raising statements that would be contradictory, and was an improper matter."

The court denied the request saying the testimony had gone in without objection. Thereafter, in rebuttal and over the objection of the appellant, the State was permitted to prove by the sheriff and the three other witnesses mentioned that Mrs. Higginbotham did tell them her husband had got home about eleven o'clock; and also that she made the statement above quoted. Appellant does not complain of the rebuttal testimony that the wife told the sheriff and the men with him her husband had come in at eleven o'clock; but does vigorously insist error was committed in permitting the State to question the wife about her statement to her husband "Now, Van, if you had been at home where you ought to have been I would know you were innocent;" and in refusing to strike out her answer that she did not make the statement; and in admitting the impeaching testimony that she did make the statement. It is assigned that the cross-examina-

tion of the wife about this matter went beyond the confines of her direct examination; that the statement was a mere expression of opinion concerning her husband's guilt; that while the evidence was immaterial and had no probative value, yet it was highly prejudicial; and that it was improper to allow the State to impeach the wife on an immaterial matter.

■ Section 3692, Revised Statutes 1929, provides the defendant in a criminal case and his or her wife or husband "shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case." It has been expressly held this statute applies to the wife of a defendant as well as to the defendant, himself; and that her cross-examination cannot be extended to matters not inquired about on direct examination. [State v. Burgess, 259 Mo. 383, 397, 168 S. W. 740, 743.] But this privilege or protection may be waived by the defendant, and where, as here, he sits by without objection and permits the cross-examination to continue to a conclusion, he will be deemed to have waived the benefit of the statute, just as it is held he may waive even constitutional immunity from giving self-incriminating testimony by testifying without objection. [State v. Faulkner, 175 Mo. 546, 615, 75 S. W. 116, 138.]

■ Furthermore, we think the evidence was competent and should have been admitted even if the defendant had made timely objection. The statute says the defendant and his wife "may be contradicted and impeached as any other witness in the case." Mrs. Higginbotham testified on direct examination that the appellant got home about nine o'clock. The rape occurred about eleven o'clock. For the purpose of impeaching her it was proper for the State to show that when she and the appellant were confronted by the sheriff and the three other witnesses about 12:30 or 1 o'clock that night, she said to the appellant, "Now, Van, if you had been at home where you ought to have been, I would know you were innocent." The evidence was highly material, and went to the very heart of the appellant's alibi.

■ II. When the appellant's daughter was under direct examination his counsel proved by her that the appellant did have or own a pistol, but that it had been at home on top of a kitchen cabinet for two months prior to September 24, 1932, the date of the crime. On cross-examination she said the appellant had not been at home for three days until he came the night of the rape; and the further evidence for appellant was that he remained at home that night until the sheriff and the others came after midnight and after the rape had been perpetrated. In rebuttal and over the objection of the appellant the State proved by two witnesses that the appellant did have a pistol in his car on the afternoon of that day, and that he

showed it to them. Appellant contends the admission of this evidence was error because it was not shown the pistol the defendant allegedly had in the afternoon was the same one the little girl said had been at home all the time; that the rebuttal testimony therefore did not tend to impeach her, but simply had the effect of proving the appellant guilty of a separate and independent crime—that of carrying a concealed weapon.

We think there was no error in admitting the testimony. Appellant's obvious purpose in proving by the little girl that his pistol had been at home for two months was to show he was unarmed that Saturday night, whereas Mrs. Eidson had testified the man who assaulted her did have a pistol. In these circumstances it was proper for the State to show in rebuttal the appellant had a pistol several hours before which he might have used in the commission of the crime. [16 C. J., sec. 1045, p. 546; State v. Francis, 330 Mo. 1205, 1210, 52 S. W. (2d) 552, 554.] Indeed, the evidence doubtless would have been admissible as a part of the State's case in chief; but from this it does not follow that the same showing could not be made in rebuttal, especially since appellant provoked the issue. The trial court has a wide discretion in such matters. [Sec. 3681, R. S. 1929; State v. Baker, 262 Mo. 689, 699, 172 S. W. 350, 354; State v. Hall (Mo.), 7 S. W. (2d) 1001, 1004.] Neither was the evidence incompetent because it tended to convict appellant of another independent crime since it had probative value in connecting him with the crime for which he was on trial. [State v. Hawley (Mo.), 51 S. W. (2d) 77, 78.]

█ III. The appellant assigns error in the refusal of three instructions, A, B and C, which he prepared and asked the trial court to give. The assignment reads that the error consisted "in not giving the jury all the law necessary for their information," as set out in said instructions. It is further stated the instructions were converse instructions, and that it was error to refuse them as such, on authority of State v. Ledbetter, 332 Mo. 225, 58 S. W. (2d) 453, 454.

We shall not burden this opinion by setting out these three instructions at length. In substance Instruction A told the jury the law requires the State to prove the defendant's guilt beyond a reasonable doubt, and does not require the defendant to prove an alibi beyond a reasonable doubt; and that even though the evidence of an alibi may fall short of the weight of moral certainty, yet if it left the jury in doubt they must give the defendant the benefit of that doubt the same as on any other point in the case, and if they had such reasonable doubt they should acquit.

Instruction B directed the jurors to discuss the case and to reason with each other about the evidence adduced by both sides, and told them that before a verdict of guilty could be returned "there must

be twelve concurring minds in the guilt of the accused;'' that- no juror should vote guilty or not guilty merely because his fellow jurors had so voted; that ''before you return a verdict of guilty in this case it must be the separate and independent verdict of each juror concurred in by all twelve of you; and that unless all twelve jurors believed from the evidence beyond a reasonable doubt that the defendant was guilty as charged, they should acquit.

Instruction C said: ''If there is any evidence before you that raises in your minds a reasonable doubt as to the presence of the defendant at the time and place where the crime is charged to have been committed (if you find a crime was committed) you will acquit the defendant.''

It will be seen these instructions iterate three times that the defendant cannot be convicted unless the jury find him guilty beyond a reasonable doubt. Instruction A further says that if the alibi evidence raises a doubt or uncertainty in their minds they should acquit. Instruction B says each juror as a matter of separate and independent judgment must concur in a verdict of guilty based on a finding of guilt beyond a reasonable doubt. And Instruction C again generally says that if any of the evidence raises a reasonable doubt in the minds of the jurors they must acquit.

While it is, of course, unquestioned, that the jury in a criminal case must find the defendant guilty beyond a reasonable doubt before he can be convicted, the defendant has no right to ask that that fact be stressed and repeated in such manner as amounts to a suggestion to the jury that under the evidence there is a reasonable doubt of the defendant's guilt. The State's instructions had fairly covered the case. ■ Instruction No. 1 was the main instruction on the facts, and also defined the words ''ravish'' and ''carnally know'' as meaning actual penetration. Instruction No. 2 stated that to constitute rape the intercourse must have been accomplished forcibly and violently against the will of the female, without her consent and against her utmost resistance. Instruction 4 was on the credibility of the witnesses. Instruction 5 was on reasonable doubt and the presumption of innocence. And Instruction 3 on the alibi contained the following:

''It devolves upon the State to prove beyond a reasonable doubt the presence of the defendant at the time and place when and where the offense was committed, if you find it was committed, and if upon a consideration of all the evidence you have a reasonable doubt of the presence of the defendant at the time and place when and where the offense was committed, if you find it was committed, then you will find the defendant not guilty.''

In view of these instructions given at the request of the State, it cannot be said the State failed to instruct on all the law of the

case. Neither were the instructions asked by the defendant converse instructions on any matter not fully and fairly covered by the State's instructions. The refusal of the appellant's three requested Instructions A, B and C therefore was not error. [State v. Prunty, 276 Mo. 359, 208 S. W. 91, 95; State v. Tracy, 294 Mo. 372, 243 S. W. 173, 178; State v. Williams, 309 Mo. 155, 184, 274 S. W. 427, 435; State v. Heady, 316 Mo. 111, 289 S. W. 564, 565; State v. Fike, 324 Mo. 801, 24 S. W. (2d) 1027, 1030.]

■ IV. There is one other specific assignment that the evidence in this case fails to show penetration, and that in her account of the assault upon her the prosecuting witness did not testify to that fact. We think this point is wholly without merit. Mrs. Eidson testified that the appellant "accomplished his purpose" and by force had "sexual intercourse" with her. This was sufficient to establish the fact of penetration. [State v. Williams, 263 Mo. 603, 608, 173 S. W. 1051, 1052.]

■ V. In addition to the foregoing it is assigned generally that the verdict of the jury was the result of bias and prejudice; that it was for the wrong party; that it was against the law under the evidence, against the evidence and against the weight of the evidence; and that the punishment assessed by the jury was cruel and unusual. These assignments are too general to call for discussion. There is nothing in the record to substantiate the assertion that the jury was swayed by bias and prejudice or that the punishment inflicted was cruel or unusual. If the appellant committed the rape—and there was substantial evidence that he did—there is nothing to warrant our interference. We find no error in the record proper and the judgment is, therefore, affirmed. All concur.