THE STATE v. PAUL BAGBY, Appellant.—93 S. W. (2d) 241.

Division Two, April 23, 1936.

*H. P. Lauf* and *John O. Bond* for appellant.

954

*Roy McKittrick*, Attorney General, and *Franklin E. Reagan*, Assistant Attorney General, for respondent; *Charles Farrar* of counsel.

ELLISON, J.—The appellant was convicted of robbery in the first degree by means of a deadly weapon in the Circuit Court of Webster County on change of venue from Dallas County, and his punishment assessed by the jury at imprisonment in the penitentiary for a term of twenty-five years. The charge was that he robbed Milum Bledsoe, cashier of the First State Bank of Long Lane in Dallas County. His defense was an alibi. The principal issue of fact in the case turned on his identification as one of the robbers. The assignments urged on this appeal complain of error in the cross-examination of the appellant and his witnesses; in the admission of incompetent evidence; in the failure properly to instruct the jury on all the law of the case; and that the verdict was against the evidence, the result of passion and prejudice, and fatally defective.

Mr. Bledsoe, the bank cashier, with his wife also operated a combined gasoline filling station and store. Their living quarters were over the store. The bank was about thirty feet distant across the street. On the night of December 22, 1932, they were playing a game called rook at their home with two acquaintances, Messrs. Leverett Cansler and Earl Vest. About eight-forty-five o'clock two

men knocked at the door and when Mr. Bledsoe appeared said they wanted to buy gasoline. Then they drew pistols and announced it was a "holdup." One of the men gave Mr. Bledsoe a flashlight and forced him to lead the way to the bank. The other man remained in the apartment and kept the other members of the party covered.

At the bank the robber made Mr. Bledsoe open the safe and the vault. He took all the money there amounting to about $340, of which perhaps $40 or $50 was in dimes wrapped up in $5 lots; also some bonds and notes. While so engaged someone on the outside shook the door and said "Hurry, there is somebody in sight." Presently they returned from the bank to the apartment where the robber put the box containing the loot on the back porch and called out to someone "here it is, come and get it." From this Mr. Bledsoe concluded three persons were involved in the robbery: the man who took him to the bank, the one who remained with the others in the apartment, and an unseen person on the outside. When they got back to the apartment the two robbers compelled Mr. Bledsoe, his wife and their two guests to go to the bank and there locked them in the vault. They were confined for some little time until Mr. Bledsoe by the use of his pocketknife was able to unscrew certain parts of the lock and open the vault door. He estimated it was nearly ten o'clock by the time they had released themselves and returned to their apartment.

On the identification of the robbers: Mr. Bledsoe testified he never saw above the shoulders of the robber who took him to the bank, but he was wearing boots, light colored breeches and a close fitting jacket of dark color. During the course of the robbery this robber did a good deal of talking, at one time saying "You foiled us two weeks ago, but we are here to get the money and are going to get it." A few days later when Mr. Bledsoe viewed the appellant after he was under arrest and confined in the jail at Springfield he thought he remembered the appellant's voice was like that of the robber who locked him in the bank vault, and of one of two men who fifteen days before the robbery had come to his home about eleven o'clock at night and purchased some gasoline from his daughter and her cousin. It was Mr. Bledsoe's opinion that in voice, actions, height and general appearance the appellant Bagby was very much like the robber who "handled" him, but he would not positively swear to it. He also testified that about six or seven o'clock in the evening, two or three hours before the robbery, the appellant, with another man, had been at his filling station and purchased two quarts of oil. Their car was a black or dark colored coupe. At that time the appellant had a small black moustache and was wearing boots and light breeches. On redirect examination certain boots, breeches and a jacket admitted to belong to the appellant, were exhibited to

Mr. Bledsoe and he said they were like the apparel worn by the man who robbed the bank. During his entire testimony he did not attempt to describe the other robber, the one who kept Mrs. Bledsoe and their guests corralled in the apartment, except to say the man did not have on an overcoat.

Mrs. Bledsoe definitely identified the appellant as the robber who took her husband to the bank and came back with him. Being asked if the appellant seated in the courtroom was the robber she said "Yes, sir, it sure was; I would know him anywhere any time." She also said she recognized him when she viewed him in the jail at Springfield two days later, and that there was not a bit of doubt in her mind as to his identity. She admitted, however, that she was much excited during the holdup and that she could not remember clearly about the clothes the appellant wore except that she thought he had boots on. But she insisted she knew his face and remembered he was wearing a wide-brimmed black hat with a high crown, uncreased. She did not notice that he had a moustache. The robber who remained in the apartment wore a dark overcoat, cap, black oxford shoes and faded blue overalls. When they got out of the bank vault and returned to the apartment it was nine-forty-five P. M.

A neighboring storekeeper, Mr. Ray Bird, also saw the appellant and another man at the Bledsoe filling station about six-thirty o'clock the evening of the robbery. The appellant was wearing boots, light colored breeches, a light coat and a light hat. He thought the jacket offered in evidence was similar to the one appellant was wearing at the time and said the man with the appellant was Jimmy Ryan, as he discovered the next day when Ryan was brought to Long Lane for identification.

Paul Peel was a farmer living about a mile west of Long Lane. The appellant came to his house on the night of the robbery about nine-fifteen o'clock and got him to take his team and pull his (appellant's) car out of the ditch at a point a little over a quarter of a mile west of Long Lane, which was on the way to Buffalo and Springfield. The appellant was wearing a pair of boots, light colored trousers and a leather suede jacket. He had a light or white hat, not a black one. He did not have a moustache. (Mr. Peel's wife, also, could not recall the moustache.) He said two cars had passed him, one on either side, and crowded or knocked him off the road. Examination of the wheel tracks on the damp highway the next morning did not verify this but showed appellant's car had traveled on a straight oblique course for a distance of fifty or sixty steps until it ran off the left side of the highway.

Two other parties, Mr. McArren and Squire Brownfield, came up before Peel and the appellant had left and announced the bank had been robbed. The appellant gave his correct name and showed his

hunting license and said he was going to Springfield. He promised Mr. McArren to notify the sheriff at Buffalo of the robbery. (The telephone wires to Buffalo had been cut.) Mr. McArren was sure he had a small dark moustache, and that he wore boots and light breeches. Squire Brownfield did not notice any moustache. The automobile was a dark yellow or dun colored coupe. The appellant told Squire Brownfield he had been "out south" getting some whiskey.

While all four of these parties—the appellant, Peel, McArren and Brownfield—still were at the point where the automobile had been pulled out of the ditch, Mr. Peel saw a man pass, walking east on the road back toward Long Lane. They spoke to each other, and when Peel told McArren and Brownfield about it they followed in that direction. About seventy-five yards east of the car they heard the brush breaking at the side of the road. They turned their flashlight that way, saw a man lying in the brush or weeds, and made him come out. The man had a .32 revolver. It was Jimmy Ryan whom Mr. Bird had seen at the Bledsoe filling station with the appellant earlier in the evening. Mr. and Mrs. Bledsoe and their two guests were unable to identify Ryan as one of the robbers.

When McArren and Brownfield started east in pursuit of the man who turned out to be Ryan Peel started west toward his home with his team. The appellant also started west in his car but after he had gone about one-half mile (judging from his auto lights) he turned around and came back east, passing Peel, and also McArren and Brownfield. The car continued into Long Lane and a little beyond the main cross road, turned around, and again came west at a rapid speed passing McArren and Brownfield, and Peel, though Squire Brownfield did not remember its passing the second time.

Scott Curtis, the sheriff of Greene County, arrested the appellant at a private home in Springfield the day after the bank robbery. He had in his possession about forty dimes, and no other money— which he said he had got in a crap game. No other part of the bank loot and no firearms were found there. He said he had been in Long Lane the night of the robbery to get fifteen gallons of whiskey, and that he had shaved off his moustache "because he didn't want to be identified close to that bank job up there." On being asked why he had gone to a hotel (when he first got back to Springfield) and registered under an assumed name, he stated it was because he did not want to get a woman into trouble. The sheriff and his officers found some clothing in the appellant's room which they took into custody. It was the boots, breeches and jacket introduced in evidence. The appellant admitted they belonged to him.

They asked him about the notorious criminal Al Capone. After several questions and objections the sheriff testified: "Oh, we joked

him in regard to Al Capone; he did say he knowed them—(more questions and objections). Well, that is about all there is to tell about it; he didn't deny knowing him, when he was asked about it, and he said 'you boys don't know but what I am Al myself;' That is about the way he talked.''

On cross-examination the following questions and answers make up the testimony on this point:

"Q. Now, you say that Bagby and the officers were joking with one another, there in·your presence? A. Quite a bit of comedy.

"Q. And he told you that he might be Al Capone, as far ·as you knew? A. Well, he made that remark.

"Q. And that was all a jest—joking? A. No, it wasn't in a jest.

"Q. Wasn't he joking when he said he might be Al Capone? A. Well, I suppose he was.

"Q. Wasn't everybody laughing? A. Well,. I suppose some of them was, part of the time.

"Q. As you stated while ago, they were laughing and going on, and he said 'I might be Al Capone'? A. Well, yes.''

It appears that the appellant, following his arrest the latter part of December, 1932, was released on bond in June, 1933. Upon his failure to appear at the September Term, 1933, of the Webster County Circuit Court, his bond was forfeited and a capias warrant issued for him. He did not appear at the January Term, 1934, and was not apprehended until he surrendered himself a few days before the trial in May, 1934.

Leverett Cansler and Earl Vest, the two guests who were playing rook with Mr. and Mrs. Bledsoe the night of the robbery, both were called as witnesses by the defense, and testified that neither of the two robbers they saw was the appellant. Cansler declared the robber who took Mr. Bledsoe from the apartment down to the bank was not wearing boots, light breeches and a jacket, but had on a dark suit and a black cowboy hat. He wore no overcoat. The other robber who remained in the apartment guarding the other members of the party had on overalls and a light overcoat. Cansler was shown a picture of a police character in Springfield known as "Screwdriver" Gann and said it looked like the robber who took Bledsoe to the bank. Mrs. Bledsoe testified the robber who stayed in the apartment resembled Gann. Cansler said that he went to Springfield with Mr. Bledsoe and viewed the appellant after he was under arrest, and that at that time he did not think the appellant was one of the robbers and so stated to the officers.

Mr. Vest agreed that the robber who took Mr. Bledsoe to the bank wore a dark suit and hat; and that the other robber had on overalls and an overcoat. As he recollected it was nine-twenty when

they all got out of the bank vault. He went over to Squire Brown-field's home and notified him of the robbery. He looked at the appellant as he sat in the courtroom and expressed the opinion that he was not one of the robbers. One of the two had two or three days' growth of beard on his face but neither wore a moustache.

The appellant testified that the clothes in evidence were his, and that he was wearing them the night of the robbery; that he stopped with another man at the Bledsoe filling station in Long Lane about six-thirty o'clock that evening and purchased oil from Mr. Bledsoe; that he returned through the village that night a little before nine o'clock; that a short distance further on his car was crowded off the road into the ditch and he got Mr. Peel to pull it out; that Ray McArren and Squire Brownfield came along while they were there and announced the bank had just been robbed; that he promised to notify the sheriff at Buffalo of that fact when he drove through there; that he started on toward Buffalo but turned around and came back to Long Lane, and there turned around again and returned along the same road to Buffalo and Springfield.

But he denied the man with him when he purchased the oil from Mr. Bledsoe was Jimmy Ryan. He said the fellow was a hitch-hiker he did not know, whom he had picked up on the road between Buffalo and Long Lane that afternoon. He accounted for his whereabouts between the oil purchase and his return through Long Lane about nine o'clock, by saying he made a round trip over an unfamiliar country road to a point about eight miles south where he had got a load of whiskey. He stoutly denied that he had anything to do with the bank robbery, and insisted he did not even stop at Long Lane when he passed through that night. He said he was wearing a light hat and not a black one.

He explained his unusual action in starting west toward Buffalo after getting his car out of the ditch, then turning around and going back to Long Lane, and there turning around without stopping and returning along the road to Buffalo and Springfield, by saying he noticed the oil gauge on his car was not registering, which led him to believe he might need oil. But when he got to Long Lane he saw no lights in any of the filling stations. The sides of the main road by the filling stations were muddy so he turned north to a space in front of the church where he circled his car about and came back. It occurred to him also that he would better not stop because of the bank robbery, of which he had just theretofore learned. The State's evidence was that the sides of the main road by the filling stations were graveled and not muddy, and that the place in front of the church was muddy. He further admitted that when he got to Buffalo he did not notify the sheriff of the bank robbery, and said this was because he was a stranger in that country, had a load of whiskey in his car, and was afraid to take any chances.

The appellant admitted also that when the sheriff arrested him he had a "handful" of dimes in his possession but said he kept them on hand to make change when selling whiskey by the drink. He further admitted, however, that he told the sheriff he used them for shooting dice. He explained also that he did tell the officers he had seen Al Capone and that he might be Capone for all they knew, but asserted this was all in jest.

On the matter of his flight after being released on bond, he said he reported to his attorney, Mr. Lee Kinder of Springfield, before the September Term, 1933, of the Webster County Circuit Court, and on the testimony's being excluded offered to prove the attorney told him the case had been fixed up with the prosecuting attorney for $200; that he came back for the January Term, 1934, of court as far as the courthouse at Marshfield with his attorney, Kinder, who, after inquiry, told him court had adjourned; that he later employed another attorney, Mr. Collins, through whom he surrendered himself to the sheriff before the May Term of court at which the case was tried. On cross-examination he was asked if the reason for his return and surrender was not because he had heard through the newspapers or otherwise that the principal witness against him, a woman by the name of Bledsoe, had been killed in an automobile accident, and if he had not so told a man named Doc Williams of England, Arkansas. His answer to these questions was in the negative.

The appellant was further asked on cross-examination if he had ever been convicted of any crime at Salina, Kansas, and over the objection that the question did not specify the date, place and nature of the crime was permitted to answer that he had paid a fine there for disturbing the peace, in a court other than the city court. He was further asked if he had been convicted of any criminal offense in New Orleans, Louisiana, and answered that he was convicted in 1928 in the Federal court for a violation of the Dyer Act, and received a sentence of a year and a day, which he served in the Federal prison at Atlanta, Georgia. His own counsel, on direct examination had already asked him about the conviction in New Orleans. But the State's counsel went further and asked him if he was not also convicted in New Orleans on October 28, 1928, of vagrancy, fined $25 and given twenty days in jail. He denied it.

John W. Bell, one of appellant's bondsmen, was called as a witness for appellant. He testified that he knew appellant's attorney Lee Kinder, of Springfield, and that Kinder told appellant he need not appear at the September Term, 1933, for the trial of his case. He also testified he came with Kinder and appellant to the January Term, 1934, of the Webster County Circuit Court and that Kinder after investigation informed appellant the court had adjourned.

This corroborated appellant's testimony on these points.

The State impeached the appellant's witness Leveret Cansler by proving by three witnesses that his general reputation for truth and veracity was bad.

I. The first assignment in appellant's motion for new trial is that the verdict of the jury was "against the law, against the evidence, against the law under the evidence, and is the result of passion and prejudice, and that the punishment assessed by the jury is both cruel and unusual under the evidence." In his brief and argument here the appellant goes further and contends the State's evidence was too conflicting and weak to warrant the submission of the case to the jury, and that the verdict was the result of passion and prejudice engendered by irrelevant and inflammatory matter brought into the case by the State's counsel through improper cross-examination of the appellant and his witnesses.

Notwithstanding substantially the same assignments in motions for a new trial have been held too general and indefinite under Section 3735, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3735, p. 3275), to preserve any of the suggested questions for appellant review, State v. Smith (Mo. Div. 2), 68 S. W. (2d) 696, 697 (1); State v. Higginbotham, 335 Mo. 102, 113, 72 S. W. (2d) 65, 70 (8); and although the assignment clearly is insufficient to present the question urged in appellant's brief that the State's evidence was too weak to warrant the submission of the case to the jury, State v. Sherry (Mo. Div. 2), 64 S. W. (2d) 238, 239 (1); nevertheless, we have set out the evidence at some length in our statement of the facts to show it was not weak.

It is true there is conflict in the testimony of the four eyewitnesses as to the dress and appearance of the appellant; whether he wore a black hat or a light hat; whether he had a moustache or not; whether his car was dark or light colored; and as to the exact time when the robbery was committed and how long it took the robbers to consummate it. But, on the other hand, the appellant admitted he was in Long Lane at about the time it occurred, and that he was still in the vicinity when Ray McArren and Squire Brownfield notified him the crime had been committed. In fact, that is the reason he left in a hurry. His explanation of his comings and goings that evening is not satisfying. His testimony contradicted his statements to the officers at the time of his arrest on some points. Though Mrs. Bledsoe admitted she was excited during the robbery she swore positively she could identify appellant as one of the robbers. The testimony of Mr. Bledsoe on this point was substantial. [State v. Blackmore, 327 Mo. 708, 715, 38 S. W. (2d) 32, 34; State v. Scobee, 331 Mo. 217, 228, 53 S. W. (2d) 245, 251.] Under Section 4061,

Revised Statutes 1929 (Mo. Stat. Ann., sec. 4061, p. 2863), his punishment for the robbery, a deadly weapon having been used, could have been death. It may be that the State's counsel went too far in the cross-examination of the appellant and his witnesses in one or two instances, and that there might be reason for reversing and remanding the case on that ground if the points had been properly preserved (questions we shall discuss later in the opinion); but we find nothing in the record indicating the verdict was the result of passion and prejudice. This assignment is therefore ruled against the appellant.

II. The next assignment in the motion for new trial urged on this appeal is that "the court erred, over the objections and exceptions of the defendant at the time, in allowing the State to cross-examine the defendant about divers matters not referred to in his chief examination." This assignment, likewise, is too general to comply with the requirement of the statute, Section 3735, Revised Statute 1929 (Mo. Stat. Ann., sec. 3735, p. 3275), that the specific grounds relied on in a motion for new trial must be set forth in detail and with particularity in separate numbered paragraphs. [State v. Goodwin (Mo. Div. 2), 300 S. W. 723, 726 (4); State v. Vigus (Mo. Div. 2), 66 S. W. (2d) 865, 867 (7).] But a consideration of it on its merits does not help the appellant. Under this head his brief contends error was committed in his cross-examination: (1) in eliciting the fact that he had been convicted of disturbing the peace in a court other than the city court at Salina, Kansas; (2) in asking if he had not been convicted in New Orleans, fined $25, and given twenty days in jail for vagrancy; (3) and in asking if the reason he returned from his flight and surrendered himself for trial was not ·because he had heard the principal witness against him, a woman named Bledsoe, had been killed in an automobile accident.

The first two of these alleged facts went to the impeachment of the appellant as a witness by proof of former convictions. Section 3692, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3692, p. 3242), does restrict the cross-examination of a defendant in a criminal case to matters referred to in his examination in chief, but it also permits a testifying defendant to be contradicted and impeached as any other witness in the case. And Section 1752, Revised Statutes 1929 (Mo. Stat. Ann., sec. 1752, p. 4021), provides the conviction of any person of a criminal offense may be proved to affect his credibility as a witness, either by the record or by his own cross-examination. Under this statute the impeachment may extend to proof of prior conviction of misdemeanors as well as felonies. [Daggs v. St. L.-S. F. Ry. Co. (Mo. App.), 51 S. W. (2d) 164, 166 (2).] And in view of both statutes, considered together, it is held a defendant who gives

testimony in his own behalf may be cross-examined concerning such convictions, notwithstanding he was not interrogated on that point during his examination in chief. [State v. Jackson, 336 Mo. 1069, 83 S. W. (2d) 87, 92 (6); State v. Alexander, 315 Mo. 199, 201, 285 S. W. 984, 985 (1).] This being so, the above assignment in the motion for new trial directed generally to the *cross-examination* of the appellant, did not reach the question of improper *impeachment* by proof of former convictions. Nowhere in the motion is there any assignment challenging his impeachment.

The third specification in the brief under this assignment, complaining that the appellant was asked if he had not surrendered himself for trial because he thought the principal witness against him was dead, is not well grounded. That line of questioning did not offend against Section 3692 because the matter was referred to in his examination in chief. He there gave his version of why he absented himself after he had been released on bond and why he later returned, and the State had a right to show by his cross-examination that he was actuated by a different reason. [The Dayton Folding Box Co. v. Danciger, 161 Mo. App. 640, 650, 143 S. W. 855, 858 (6).]

III. Error is assigned because the trial court on its own motion cross-examined the appellant's bondsman and witness, Bell, concerning the appellant's failure to appear for trial at the September Term, 1933, and the January Term, 1934, of the Webster County Circuit Court. The brief asserts this line of examination had nothing to do with his guilt or innocence, and that the intervention of the court was undue, unnecessary and prejudicial. We find in the record the examination referred to—more than two pages of it—but the appellant did not object or except, so there is nothing for appellate review.

IV. Further complaint is made because the trial court permitted counsel for the State in his cross-examination of the witness Bell to inquire if he was not acquainted with Pretty Boy Floyd and the Barrow Brothers, criminals of ill-fame; and also to ask if he did not maintain on his farm a hide-out for outlaws of that character. The appellant asserts this cross-examination was improper and prejudicial because the questions were designed to assail the credibility of the witness by imputing to him association with notorious criminals although that fact was immaterial to the issue; and that the inquiry was not made in good faith because the State made no attempt whatever to disprove the witness's denial of the fact. The record shows the following:

"Q. I will ask you if you don't make that, down on your farm

in that community, a hide-out for a bunch of fellows of that character?

"By Mr. Collins: We object, your Honor; he is asking that only for the purpose of prejudicing the jury.

"By Mr. Reagan: We are prepared to prove it if the gentleman wants us to.

"By Mr. Collins: We ask that the gentleman be reprimanded for saying that he is prepared to prove it.

"By Mr. Lincoln: And we object for the further reason that if they want to prove this man's character is bad, they must prove it by proper witnesses.

"By the Court: Well, if the question is asked in good faith, it is proper cross-examination.

"To which ruling of the Court the Defendant, by his counsel, then and there at the time duly excepted.

"By Mr. Reagen: Read the question, please.

"By Reporter: Question 'I will ask you if you don't make that, down on your farm in that community, a hide-out for a bunch of fellows of that character?'

"By the Witness: A! No, sir, I do not."

We see no merit in this assignment. When the witness was asked if he knew Pretty Boy Floyd and the Barrow Brothers the appellant's counsel without objection permitted him to answer. When the further question was asked if he did not make his farm a hide-out for criminals appellant's counsel did object on two grounds: that the question was asked only for the purpose of prejudicing the jury; and also for the reason that if the State wanted to prove the witness's bad character they must prove it by proper witnesses. Neither of these objections was good.

The State had the right to ask these questions in good faith for the purpose of discrediting the witness by impeaching his character. [State v. Williams, 335 Mo. 234, 240 (5), 71 S. W. (2d) 732, 735. (7); State v. Sherry, 64 S. W. (2d) 1. c. 240 (10); State v. Davis, 284 Mo. 695, 704, 225 S. W. 707, 709 (5).] But since they were directed to a collateral matter the State would be and was bound by the witness's answer, State ex rel. Horton v. Clark, 320 Mo. 1190, 1203, 9 S. W. (2d) 635, 640 (8), and it was improper for the Assistant Attorney General to retort "we are prepared to prove it if the gentleman wants us to," when appellant's counsel interposed an objection that his question was asked only for the purpose of prejudicing the jury. But that point is not made in the assignment. On the contrary it asserts the questions were not asked in good faith because the State made no attempt whatever *to disprove the statements* of the witness. And so, in the state of the record there is nothing calling for a reversal of the case.

V. Another assignment in the motion for new trial and brief is substantially in this language: that the court erred in permitting the State's counsel to indulge in slurring intimation in the cross-examination of the appellant's witnesses in an endeavor to reflect on their credibility, and that the court further erred in not rebuking counsel both for the manner of their examination of the appellant's witnesses and prejudicial and unfair remarks made to the jury in the argument of the case. Obviously this assignment is too general to conform to the new trial statute, Section 3735, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3735, p. 3275). It does not point to the cross-examination complained of, or even to the witness who was subjected to it. Neither does it specify what objectionable remarks were made to the jury during the argument.

But since the incident mentioned in paragraph IV hereof probably was in the mind of the pleader we shall again refer to it. As will be seen from the part of the record quoted above, when the Assistant Attorney General asked the witness Bell if he did not make his farm a "hide-out" for criminals, defendant's counsel objected that the question was asked only for the purpose of prejudicing the jury. The Attorney General answered in the presence of the jury "We are prepared to prove it if the gentleman wants us to." Defendant's counsel then asked the court to rebuke the Assistant Attorney General for that statement. But another of defendant's counsel then interrupted with an objection and the request for a rebuke was not passed upon or thereafter mentioned and no exceptions were saved. In view of these facts, the attitude of counsel on both sides, and the vague assignment in the motion for new trial, there is no ground for reversal under this assignment.

VI. Appellant complains bitterly in his brief because the court permitted counsel for the State to prove by the State's witness Collins, sheriff of Greene County, that at the time of appellant's arrest he admitted knowing the notorious criminal Al Capone. But the motion for new trial does not cover this assignment. There is nothing in it complaining even generally of the admission of evidence for the State on direct examination. All the assignments touching on the admission of evidence are directed to the cross-examination of appellant and his witnesses. But we may add, in this connection, that when the appellant took the witness stand he admitted on direct and cross-examination substantially all the conversation with the sheriff about Capone, which, it seems, cured the error, if it was error. [State v. Nasello, 325 Mo. 442, 465, 30 S. W. (2d) 132, 140 (29).]

VII. The fifth assignment in the motion for new trial, also covered by assignments 1 and 9 in the brief, is that "the court erred,

over the objections and exceptions of the defendant at the time in not instructing the jury on all the law necessary for their information in arriving at their verdict, and particularly in not giving an alibi instruction in regular form'' because the appellant's only defense was an alibi. Neither of these specifications is definite enough to comply with the new trial statute. [Sec. 3735, R. S. 1929 (Mo. Stat. Ann., sec. 3735, p. 3275).]

It was held even before the enactment of Section 3735, and has been consistently ruled since, that an assignment in a motion for new trial generally complaining of the failure to instruct on all the law of the case is insufficient. [State v. Espenschied, 212 Mo. 215, 222-3, 110 S. W. 1072, 1074 (3); State v. Sydnor, 253 Mo. 375, 380, 161 S. W. 692, 693 (1); State v. Simon, 317 Mo. 336, 345, 295 S. W. 1076, 1080; State v. Maness (Mo. Div. 2), 19 S. W. (2d) 628, 630 (6); State v. Woolsey (Mo. Div. 2), 33 S. W. (2d) 955, 957 (9); State v. Tummons (Mo. Div. 2), 34 S. W. (2d) 122, 124 (10); State v. Layton, 332 Mo. 216, 224 (9), 58 S. W. (2d) 454, 458 (9); State v. Batey (Mo. Div. 2), 62 S. W. (2d) 450, 451 (2); State v. Vigus, 66 S. W. (2d) 854, 856 (6); State v. Copeland, 335 Mo. 140, 148 (1), 71 S. W. (2d) 746, 750 (2); State v. Barr, 336 Mo. 300, 78 S. W. (2d) 104, 106 (6).]

The second specification, that the court erred in not giving an alibi instruction in regular form, is no better. The court was not bound to instruct the jury upon the defense of alibi as a part of the law of the case under Section 3681, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3681, p. 3227), without a request from the defendant for such instruction. [State v. Parker, 301 Mo. 294, 301 (5), 256 S. W. 1040, 1042 (5); State v. Cardwell, 312 Mo. 140, 145, 279 S. W. 99, 100 (3); State v. Hadlock, 316 Mo. 1, 7, 289 S. W. 945, 947 (3); State v. McCullough, 316 Mo. 42, 48, 289 S. W. 811, 813 (3); State v. Sandoe, 316 Mo. 55, 65, 289 S. W. 890, 894 (10); State v. Wilson, 321 Mo. 564, 569 (4), 12 S. W. (2d) 445, 447 (4).] The Cardwell and Wilson cases, just cited, give as one of their reasons that alibi is an affirmative defense. In citing them we are not to be understood as subscribing to that view. [See 16 C. J., sec. 1004, p. 533, sec. 1588, p. 777; State v. Howell, 100 Mo. 628, 663, 14 S. W. 4, 14; State v. King, 174 Mo. 647, 655, 74 S. W. 627, 629; State v. Malone, 327 Mo. 1217, 1228, 39 S. W. (2d) 786, 790 (6).]

But as a matter of fact this assignment was not aimed at the proposition that the court failed to instruct on alibi. The appellant's real contention, as disclosed by his brief, is that the court did give an instruction on alibi but that it was not ''in due form.'' There is an instruction on alibi in the record telling the jury that if they found the appellant was not in the bank at the time of the robbery and did not take the money alleged, they should acquit him. Ap-

pellant contends this instruction was erroneous because it misled the jury and presented the defense of alibi to them as if it were a separate affirmative offense which the appellant was required to establish.

After the appellant filed his original brief in this court the State filed a motion in the Circuit Court of Webster County to correct alleged error in the bill of exceptions, *nunc pro tunc,* and by parol evidence proved that the original instruction on file there was in the handwriting of one of appellant's counsel. Thereupon an order was entered in the trial court amending the bill of exceptions by showing that said instruction was given at *appellant's* request, not at the request of the State. In a reply brief the appellant vigorously challenges that procedure, and contends the amendment was improperly made because the fact that the instruction was in the handwriting of appellant's attorney is not a sufficient record basis for the entry of an amendment *nunc pro tunc* showing the instruction was given at appellant's request.

We shall not go into that question. Even if the instruction was given by the court at the request of the State, as the appellant contends, the assignment in the motion for new trial that the court failed to give an alibi instruction in regular form is not sufficiently definite under Section 3735, Revised Statutes 1929 (Mo. Stat. Ann., sec. 3735, p. 3275), to challenge the form of the instruction. It complains of the *failure to give* a proper instruction, not of error in the instruction given, State v. Espenschied, 212 Mo. l. c. 222-223, 110 S. W. l. c. 1074. And it wholly fails to state wherein the instruction was defective. Assignments going much further in enumerating defects in an instruction have been held insufficient under the statute. [State v. Sinovich, 329 Mo. 909, 916, 46 S. W. (2d) 877, 889 (9).]

VIII. The information in the case charged the appellant under the Habitual Criminal Statutes, Sections 4461, 4462, Revised Statutes 1929 (Mo. Stat. Ann., secs. 4461, 4462, pp. 3065, 3066), alleging a prior conviction of a felony in Louisiana. The verdict was "We the jury find the defendant, Paul Bagby, guilty as charged, and assess his punishment," etc. Appellant contends the finding of guilty *as charged* must be construed to mean the jury convicted under the Habitual Criminal Statute, supra, and he assigns error in the brief becuse the court failed to give an instruction declaring the law under that statute. It would be enough to say of this assignment that there is nothing in the motion for new trial to support it. No complaint is there made of failure to give such an instruction. But it is further true that the finding of "guilty as charged" did not import a conviction under the Habitual Criminal Statute. [State v. Sumpter, 335 Mo. 620, 626, 73 S. W. (2d) 760, 762 (4).] The jury were not instructed under that statute. The

least punishment they could have assessed thereunder would have been life imprisonment, Sections 4461, 4061, Revised Statutes 1929 (Mo. Stat. Ann., sec. 4461, p. 3063, sec. 4061, p. 2863), whereas they were instructed under the robbery statute alone, Section 4061, supra, that the punishment might range between death or life imprisonment and ten years' imprisonment and they set it as twenty-five years.

What is said in the preceding paragraph disposes of appellant's last assignment, which is that the verdict is fatally defective in form because the jury failed to make two separate findings, one as to the charge of a former conviction, and the other as to the charge of robbery. This was unnecessary. As said in State v. Sumpter, supra, the allegations in the information concerning the former conviction were not themselves a charge of crime but went only to the punishment to be assessed for the robbery charged.

There are two other assignments in the motion for new trial which have been abandoned in appellant's brief and do not call for discussion. Finding no reversible error in the record, the judgment is affirmed. All concur.