**STATE of Missouri, Respondent,**

v.

**J. L. TOMPKINS, Appellant.**

No. 45889.

Supreme Court of Missouri,

Division No. 2.

April 14, 1958.

Louis N. Goessy, Kansas City, for appellant.

John M. Dalton, Atty. Gen., Paul N. Chitwood, Asst. Atty. Gen., for respondent.

LEEDY, Judge.

Defendant was convicted of exhibiting a deadly weapon in a rude, angry or threatening manner in the presence of one or more persons, one of the offenses denounced by § 564.610, RSMo 1949 and V. A.M.S., and which is alleged to have been committed in Jackson County. The jury assessed the punishment at a fine of One Hundred Dollars, and after an unavailing motion for a new trial, judgment was rendered and sentence pronounced in accordance with the verdict, and defendant appealed.

■ The defendant has filed no brief. We look, then, to the motion for a new trial for his allegations of error, and review such of them as are sufficient to comply with the requirements of Rule 27.20, Supreme Court Rules, 42 V.A.M.S., one of which being (by great liberality of construction) his challenge of the sufficiency of the evidence.

The evidence for the state was, in substance, as follows: On the evening of Nov. 11, 1955, Anthony Barber, the prosecuting witness, aged 18, was in his father's brand new Ford automobile parked in the lot at the Crest Food Center, 115th & U. S. Highway 71 in Jackson County, when and where the rear end of the Ford was struck by a car driven by the wife of defendant. Anthony testified Mrs. Tompkins was so heavily intoxicated that she was unable to walk. (Another state's witness also testified to this effect.) The prosecuting witness then inquired if she would like for him to take her home, and she said she would, and would appreciate it very much; "She said she would be glad to fix my car * * * and settle up any damage that was done to it." Arriving at the Tompkins home on 114th Street a few blocks from the market, he carried her groceries in and set them on the kitchen table, help-

ed her in the house and "told Mr. Tompkins what had happened." Anthony's wife, driving the Ford, had, by his direction, followed and parked in the Tompkins driveway behind the Tompkins car, the latter having been nosed up to the garage door. Defendant and the prosecuting witness went outside to inspect the Ford, defendant taking along a flashlight, but they were unable to see anything that was seriously wrong. The prosecuting witness testified he then stated that if something came up in the daylight that they couldn't then see, that he would like to have his car fixed, to which defendant replied that he didn't think it was hurt at all. Defendant then said, "Come on in the house, I want to talk to you." Anthony complied, and followed defendant into the house, closing the door behind him. According to Anthony, defendant went in another room, and he (the witness) heard a gun cocked, and defendant came out with a .22 pump rifle. "He came out with it and pointed it directed at me and he told me he was going to teach a young smart aleck like me a trick, he was going to teach me to get so smart and cocky. I told him I didn't want any trouble, if he was going to take that attitude I didn't want my car fixed and I would just as soon forget all about it. I asked, 'Do you want me to go?' He said, 'No, you are not going to go, I want to teach you a lesson.' I was talking with my hands, he said, 'Try to take the gun away.' He tried to hit me two or three times with the gun, I blocked all the blows with my hands, then I asked him if I couldn't go again. I said, 'I would like to forget all about this, I didn't want any kind of trouble like that.' Mrs. Tompkins told him to let me leave, not to do anything they would be sorry for later. He told her to shut up. I said I would appreciate if he would let me go. I was pretty scared and stiff. He said, 'Just go ahead and go.' So when I left I took an open door and closed it behind me, I run through part of the garage to my car, I yelled to my wife to start the car and get going. She didn't quite understand I was on gravel and

didn't stop running. To get to my car I had to run around it and get in on the other side. At that time when I was getting in I heard the shot, then when I was backing out I saw the gentleman shooting at us then as we were backing up." This witness further stated that when in the kitchen he noticed that "defendant had been drinking, he was intoxicated."

The evidence for the defense, which consisted of the testimony of the defendant and his wife, sharply contradicted that of the state. The defendant is a dentist with an office in his home, and for 33½ years he had also been employed at the post office. He is a Navy veteran of World War I with 55 months of service. He testified that when his wife returned from the food market a stranger was following her into the house whom he had never seen, and his wife was hysterical and crying. When she told him that the prosecuting witness claimed that she had hit his car, he (defendant) said, "Well, we will go out and look at it;" that he picked up a fishing lantern and turned a switch in the garage which turned on the lights in the lamppost at the gate, then he and Anthony went out and examined the car, but he couldn't find a thing where the car had been touched. Whereupon, he (defendant) walked back into the garage, and without having said anything to the prosecuting witness the latter followed him in there and demanded $50 to call it even, which he declined, saying, "I ain't giving nobody $50. I don't see anything wrong with the car." Anthony then called him a vile name and threatened to whip him, and struck at him. "I threw up the lantern like that, he hit the lantern, I backed away from him, got in the kitchen door, he followed me in there. My wife was sitting at the dinette table crying, still crying. I told her, 'This man says you hit his car and he wants $50.' She said, 'Don't you give him $50 because there wasn't any wreck.' He said to the wife, 'You are a damn liar,' and hit her in the mouth. I was standing at the entrance of the kitchen

door that goes into the hallway, dining room and went to the linen closet, I thought that was enough, it is about twenty-five feet through there to the linen closet and got my rifle which was in the case. I came back to the kitchen door where I was standing. He was standing over leaning against the sink and I said, 'I think you had better leave and I mean leave.' He says, 'You old son-of-a-bitch, I will hit you in the mouth,' and he lunged at me. Being the practice also in the Navy and the Army I flipped my hand up like that and caught him in the wrist. He struck and went down that way (indicating). He says, 'The hell with you, I will go in my car and get my equalizer that equals what you got.' He goes out the back door, my wife and I followed him. I took the cover off the rifle. We walked out there and stood at the entrance of the garage. He went on the left side of the car, reaches into, comes back out, closed the door and went around to the other side. That is when I was holding the gun up like this and shot up through the overhead door. He backed out and took off."

The testimony of defendant's wife corroborated his version of the occurrence, and, in addition, she denied that there had been any contact between the two automobiles at the food market. She testified that the prosecuting witness, whom she did not know, jumped in her car and pushed her aside, saying, "I saw you in the store, you were so drunk, and I am going to drive you home." She denied, as did the defendant, that either of them were drinking. She also testified that when defendant and the prosecuting witness went out to examine the car, her husband told her to telephone the sheriff's office, which she did, not only once but a second time, but before "they" arrived from the sheriff's office, Barber had gone.

■ Under the facts above outlined it is quite evident that it was for the jury to say which version of the occurrence it would believe, and not for the court to

rule the question as one of law. The jury chose to believe the state's witnesses, under whose testimony there was substantial evidence to support the charge, and hence defendant's motion for a judgment of acquittal offered at the close of all the evidence was properly denied.

The first two paragraphs of the motion for a new trial seek to raise points concerning instructions, including those actually given as well as the failure of the court to give necessary ones as a part of the law of the case. These paragraphs read as follows:

"1. The court failed to properly instruct the jury as to all questions of law arising in the cause which were necessary for their information in giving their verdict and which also should have included the constitutional rights of this defendant in the protection of his family, home and property.

"2. That the court erred in the giving of Instructions One, Two, Three, Four, Five and Six, which were excepted to separately and collectively at the time they were given and are still excepted to by the defendant, for the reason that said instructions do not properly instruct the jury on all questions of law arising in the case which were necessary for their information in giving their verdict."

Rule 27.20 requires that the specific grounds or causes for new trial be set forth in the motion therefor "in detail and with particularity." This rule is a rescript of § 547.030, RSMo 1949 and V.A. M.S., concerning which statute this court has said: "Our decisions have repeatedly held that this statute applies to instructions to the jury, and to the failure to give necessary instructions. * * * It is not enough to complain merely that the court failed to instruct on a designated subject, such as self-defense or manslaughter, especially where it may have several aspects under the evidence. All

of the instructions challenged here, except one, are on the 'law of the case' as above explained, this. including self-defense. So, as to these, it does not matter that appellant did not request instructions on the subject. And this is true although an instruction was given, but was faulty only because it was too narrow to cover phases of the subject raised by the evidence. Consequently the issues will turn on whether the motion for new trial preserved the point." State v. Foster, 355 Mo. 577, 587–588, 197 S.W.2d 313, 318.

In State v. Brown, Mo., 165 S.W.2d 420, 422, an assignment complained that the court failed to instruct upon all questions of law arising in the case and designated the court's failure to instruct upon a particular subject, i. e., threats made against the defendant by the prosecuting witness; held, insufficient for failure to comply with the detail and particularity requirements of the motion for new trial statute. Like holdings on similar phraseology are to be found in State v. Bagby, 338 Mo. 951, 93 S.W.2d 241; State v. Cobb, 359 Mo. 373, 221 S.W.2d 745, and State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335.

■ The quoted paragraphs of the motion must, therefore, be held insufficient to preserve for review any question concerning the instructions because they fail to meet the requirements of Rule 27.20 in that they are too general, and do not set forth grounds or causes for new trial in detail and with particularity.

■ Paragraphs 4 and 5 of the motion complain (1) of the rejection of "competent, legal, proper, material and relevant evidence offered by the defendant," and (2) in admitting "incompetent, illegal, immaterial and irrelevant evidence over the objection of defendant," and (3) that "all of the evidence introduced by the state relative to what transpired at the Crest Food Store was objected to by the defendant, and should not have been admitted." These "specifications" also offend against the requirements of Rule 27.20 for the

reasons above noted, and hence will not be discussed.

■ Coupled with a general allegation of the motion for a new trial that the verdict resulted from bias and prejudice are those specifying three trial incidents as showing the trial court's "rough and rude" treatment of defendant's counsel, which, so it is charged, augmented and aggravated such bias and prejudice. The first of these is that on voir dire examination·defendant's counsel was rudely interrupted by the court cutting off his (counsel's) inquiry on the "vital subject" of whether any member of the panel was acquainted with Steve and Katharine Barber, mother and father of the prosecuting witness, who were in business as Barber Tobacco and Supply Company, 520 East 12th Street, within a block of the Court House." The record fails to reflect the incident of which complaint is thus made. On the contrary, the record shows the following: That defendant's ·counsel, without objection, albeit more than "somewhat erroneously," told the panel that the prosecuting witness and his wife, naming them, "are son and daughter-in-law of the Barber's Supply Company,"—adding "Steve Barber and Katharine Barber, 520 E. 12th Street." He then propounded these questions, none of which evoked replies on the part of the prospective jurors: "I will ask whether any of you know Steve Barber or Katharine Barber? Donna Barber or Anthony Barber? You know any of his relation, anybody at Hickman Mills? Mr. Steve Barber lives at Hickman Mills."

The second incident also arose on voir dire, and it is complained of in the following language: "When counsel for defendant inquired of the panel as to whether any of them were acquainted with Mr. Charles A. Darby, an Assistant Prosecuting Attorney, the court interrupted defendant's counsel in an extremely rude manner, stating Mr. Darby was not an Assistant Prosecuting Attorney but an Assistant County Counselor * * *."

The record shows only this in connection with the incident:

"Mr. Goessy: Charles A. Darby is connected with the Prosecutor's office. Any of you acquainted with Charles Darby?

"The Court: Mr. Darby isn't in the Prosecutor's office.

"Mr. Goessy: If the Court please, if that is not so—I took this off the record.

"The Court: He is not in the Prosecutor's office, he is in the County Attorney's office."

For aught that appears, the correction may have been in a manner most polite and deferential. At any rate, no complaint was made of it at the time, and there is nothing to suggest rudeness, nor to substantiate the claimed error. We dismiss the matter as inconsequential.

The third incident arose in connection with the cross-examination of the prosecuting witness, Anthony Barber, as follows:

"Q. Now then, were there any children born of this marriage? A. Were there any children?

"Q. Did you have any children of this marriage? A. Yes, I did, I had a little baby, my wife fell down the stairs, it was premature, and it lived only seventeen hours, six minutes.

"Q. She was thrown down the stairs, wasn't she? A. No, sir, she was not.

"Mr. Kennett: Just a minute. I object to that.

"The Court: Do not answer the question, there is an objection to the question. What is the objection?

"Mr. Kennett: He asked the witness if there was a child born of the marriage, he said there was, it was pre-

mature, lived seventeen hours and died, then counsel here starts in saying, 'Well, your wife was thrown down the stairs.'

"The Court: Your objection will be sustained and the question and answer will be stricken from the record, the jury instructed to disregard it."

The court might have been expected to show at least mild irritation over the effort to try such a collateral matter as to whether the cause of the premature birth of the child of the witness was or was not that he had thrown the mother thereof, his wife, down the stairs. The court's action was proper.

■ The remaining ground of the motion is that the court erred in refusing to produce Deputy Sheriff Menough for examination, an assignment we find not supported by the record facts nor tenable on its supposed merits. This assignment is apparently based on the following which took place at the conclusion of the testimony of the defendant himself: Defendant's counsel stated that he had served a subpoena duces tecum to produce the records of the Sheriff as to a call to the Tompkins home on the night in question, whereupon the prosecutor admitted that a deputy sheriff had called at the Tompkins home that evening. There was no request for an attachment for the witness, nor to recess until he could be contacted. In fact, the name of the proposed witness was not even disclosed. What the defendant really objected to at that time was that the court, upon objection by the state, adversely ruled defendant's offer in evidence of what purported to be a copy of a statement of the Sheriff. The statement was not identified. However, the defendant got the benefit of what he was really trying to show, namely, that the Sheriff's office had been called to the Tompkins home on the night in question about the time of the alleged difficulty, and we fail to see that any prejudice might have resulted to defendant.

We have examined the information, verdict, judgment and sentence, as is our duty under Rule 28.02, whether error is assigned thereon or not, and find no reversible error therein. The judgment should be, and it is, affirmed.

All concur.