THE STATE v. LLOYD NANNA, Appellant.—18 S. W. (2d) 67.

Division Two, June 4, 1929.

1182

*H. E. Alexander* and *W. E. Coffer,* for appellant.

*Stratton Shartel,* Attorney-General, and *Claud E. Curtis,* Special Assistant Attorney-General, for respondent.

WHITE, J.—On January 6, 1928, a jury in the Circuit Court of Cape Girardeau County found the defendant guilty of seduction, under Section 3259, Revised Statutes 1919, and assessed his punishment at four years in the penitentiary. The court in sentencing the defendant reduced the period to two years. Yet, he appealed.

Ruby Leslie, aged twenty, lived at Gravel Hill in Cape Girardeau County. How far that is from Cape Girardeau does not appear in the evidence. She had been taking instruction in the High School Training Department of the Southeast Missouri Teachers College for three years. At the times of the incidents mentioned in this case she was teaching school during the winter months and attending the summer school at the Teachers College. She had taught school at a place called Drum, forty-one miles from Cape Girardeau, in 1925-26.

In the winter of 1926-27, she taught school at Hamstring, two and one-half miles from her home at Gravel Hill; she lived at home during the time she taught there. Her school closed April 6, 1927. Later in April she began attending the summer school at Cape Girardeau, a term which continued until about the middle of August. During that term she boarded in Cape Girardeau and came home to Gravel Hill at intervals. While attending that school she met the defendant some time in May; she said at her uncle's store. Just where that store was is not clear. There a number of young people gathered in the evenings. According to her story, the defendant

began to pay her attentions, she said made ardent love to her, and she became engaged to him some time in June. Two or three weeks later, in July, he began to solicit her for sexual intercourse, expressed his love for her, told her it made no difference because they would marry soon. She submitted to him while they were driving out on the Jackson road which runs directly west from Cape Girardeau. Such intercourse occurred three or four times later at intervals of a few days, always, however, while they were driving, or in a park. She said that when they became engaged no time was set for the marriage, but it was understood that it was to take place before school began in the fall. She had engagement to teach at Drum that autumn. In August she discovered that she was pregnant, told the defendant about it and wanted him to go with her to a doctor to make sure. He said to let it go, that they would be married before anybody found it out. As her story goes, she did not see him again until late in August, when he refused to marry her. The trial began the fifth of January following. She was pregnant at that time. Her mother testified that she knew of her daughter's condition in August. On September 22nd, defendant wrote Ruby a letter which was offered in evidence by the State for the purpose of corroborating her story.

Nothing seems to have been done about it after that for some time. She began the teaching of her school at Drum in the fall. Her father had been dead a number of years and her mother had married again. Her step-father, Manse Thomas, claimed that he learned of her condition and went to see the defendant November 5, 1927, told defendant about it, and the defendant said he would do the right thing, and that he wanted to see Ruby and her mother. Later Ruby filed an affidavit for defendant's arrest. Just when that was does not appear from the record, but it was before the 19th of November, as appears from other related events, and was probably the Monday following Manse Thomas's interview with the defendant, which was on Saturday. A week later, after the charge was filed against the defendant, Thomas met him on the road; the defendant said he was going out to see the girl's mother at Gravel Hill. The girl's mother, Mrs. Bessie Thomas, although she said she knew Ruby's condition in August, went to see the defendant for the first time the Saturday after the charge was filed against him. He said to her as he had said to the step-father, that he would "do the right thing."

That appears to be the day that Manse Thomas met the defendant in the road. Defendant had with him in his car at the time two companions. Ruby testified that they came to her at Drum; that the defendant had with him Theodore Cargle and Roy Rowe. The defendant told her he wanted to take her to town to see a doctor,

and she consented to go. Instead of taking her to a doctor he took her to the office of his attorney, Mr. Alexander, who drew up an affidavit which she signed and swore to before a notary later called in. This appears in her cross-examination. That affidavit was introduced in evidence by the defendant, but somehow did not get into the record. Some of its contents appear from her statements which were not objected to. She stated in the affidavit that it was not true that the defendant had seduced her; that there was no promise of marriage, and that she was over twenty-one years of age. She testified, however, that she told Mr. Alexander then that those things were not true, but she would sign the affidavit in order to stop the matter on the condition that Lloyd would pay her hospital expenses. The implication is that the proceeding would be dismissed. She swore that Lloyd threatened to ruin her character. While being cross-examined she also admitted that on November 19th, she had made affidavit that Theodore Cargle had committed rape upon her, and that she had had him arrested for it, but that it was not true; she had lied about it. She admitted, however, the act with Theodore Cargle. This, however, occurred four months after the alleged seduction. The complaint against Cargle, it appears, was dismissed.

Mr. Alexander did not take the stand to deny her testimony that she had told him at the time that her affidavit was not true. No doubt that incident of the defendant going out after her with Cargle, bringing her in and causing her to make that affidavit in Alexander's office weighed heavily with the jury against the defendant. The girl, it would appear, was of weak resolution, easily influenced, unable to resist the pressure brought to bear upon her, and her testimony left room for suspicion that through defendant's machinations Cargle was induced to pay attention to her.

The State offered evidence to show that Ruby Leslie was a girl of good reputation. This evidence came mainly from her teachers and her school associates. The defendant offered several witnesses who swore that her reputation for chastity was bad. This came mainly from boys with whom she and Lloyd were associated. Two or three of these boys testified that they themselves had had illicit relations with her. Some witnesses testified that the year before, 1926, she had frequently gone with one John Robinson, and that she had made statements to others implicating her in improper conduct with him. He later had been sent to the Reform School. Robinson was subpoenaed as a witness by the State and was about the court room during the trial, but was not put upon the stand.

I. It is strenuously urged by the appellant that the girl's story regarding the engagement to marry was not corroborated. Section

4029, Revised Statutes 1919, requires that in trials for seduction under promise to marry the evidence of the woman as to such promise must be corroborated to the same extent required of the principal witness in perjury. The matter has been frequently before this court as to what is a sufficient quantum of corroboration. It was said in State v. Eisenhour, 132 Mo. l. c. 147:

"Positive corroborating evidence is not required either in perjury or in case of seduction under promise of marriage, but any material circumstance shown by other witnesses corroborative of the evidence of the prosecuting witness as to the perjury or promise of marriage is sufficient."

In State v. Bruton, 253 Mo. 361, l. c. 370, it is said that additional evidence need not be such as standing by itself would justify conviction, but it must at least strongly corroborate the testimony of the accusing witness. In that case Judge FARIS reviewed the authorities at some length, and discussed the character of evidence necessary to corroborate the story.

In this case the corroborative evidence relied upon consists of:

(a) The attentions which he paid to her, said to be of the character usual with an engaged couple;

(b) The promise of the defendant to "do the right thing" when approached by the step-father and mother;

(c) Presents which he was said to have given Ruby;

(d) The letter of September 22. which he wrote to her.

(a) As to the courting, the mother testified that after Ruby had started to the summer school defendant brought her to and from the Cape. came out after her and took her back, and brought her back again at different times and spent the day one Sunday. On cross-examination it appeared that she had come home several times on a service car. At one time she had come with her mother's sister. But in all the time from April to August she came or went only twice with Lloyd Nanna. Those two trips in which Lloyd Nanna came out after her and brought her home possibly occurred in May when he first began to pay attentions to Ruby, or they might have occurred after the alleged seduction in July. It is not shown that either one of those visits or the time he came on Sunday and spent the day occurred between the time of the engagement and the seduction which was two or three weeks after the supposed engagement. Such visits would not be corroborative of the engagement. Besides they were not numerous enough to constitute serious courting, or warrant inference of an engagement. The defendant's admission that he was with her often referred to the period when their illicit relations existed.

(b)   As to his doing the "right thing," this is what occurred:

The step-father testified that he found Lloyd Nanna on the Perryville road, and he said: "I told him the condition of my step-daughter and asked him what he aimed to do about it. He said, 'I will do the right thing.' "

Nanna made no denial and said he wanted to see the girl and her mother. Thomas also talked to the defendant a few days later. On cross-examination Thomas testified as follows:

"Q.   You say you told him November 5, the girl was in the family way?   A.   Yes sir.

"Q.   You say he didn't deny that?   A.   No, sir.   Didn't deny it to me. . . .

"Q.   That is what you told him and he didn't deny it?   A.   No sir.

"Q.   He said he would do the right thing?   A.   Yes, sir; he said he would do the right thing.

"Q.   That is about all that was said?   A.   Yes, sir."

In neither conversation was there any reference whatever to a marriage engagement. It was the girl's pregnancy only that was talked about. He would do the right thing about that. No one specified what the right thing was.

The right thing for him to do under the circumstances was to marry the girl, whether there was a previous engagement or not. That is what the jury would understand to be the right thing. The plight in which he had placed the girl, the welfare of a prospective offspring, due regard for his own standing and peace of mind would impel the conclusion that the right thing was marriage. His promise to do the right thing was marriage. His promise to do the right thing was not corroborative of any marriage engagement.

When Mrs. Thomas visited Nanna she told him that she guessed he knew what she was down there for. He said he did, and that he was willing to do what was right about it; he made no denial of the matter at that time. Conversation as to "what the matter was" could only refer to the girl's condition at the time. Not a word was said about a marriage engagement.

(c)   The girl testified that he made her a present of a fountain pen and a pencil. The only corroboration of that appears in the cross-examination of the defendant. When the defendant was put on the stand he simply denied that he had ever agreed to marry Ruby Leslie. Nothing further was asked. In rebuttal statements made by him at his preliminary examination were offered in evidence by the State. He there said that he met Ruby Leslie in May and that he was with her pretty nearly every night and that he had brought her a present. This evidence was objected

1188

to on the ground that the matter was not referred to in his examination in chief, and that it was not proper in rebuttal. Undoubtedly any admission of his as to giving the girl presents should have been introduced when the State was making out its case, although the trial court has certain discretion as to receiving evidence after a party has closed his case. If this evidence was offered merely to contradict the defendant on something he had said in his examination in chief, it would be admissible for that purpose, and would not be admissible to prove the facts stated. That seemed to be the case here. But assuming that this examination in the preliminary was admissible at the time it was offered, for all purposes, he merely said that he brought a present to her. He didn't say what the present was, whether it was a bit of candy or something more substantial and enduring. He didn't refer to the fountain pen which she testified about. It is very significant that her mother knew nothing about the fountain pen, at least she didn't mention it, and no one else who testified said anything about a present being given by the defendant to Ruby. Just when he gave her a present is not stated. It may have been after the seduction. If it was a substantial present such as would amount to corroboration it would have to be shown that it was presented during the engagement and before the seduction. Such a present given her after that might indicate an engagement, but not necessarily one entered into *before* the seduction.

(d)   The letter was mailed at Cape Girardeau, September 22nd, probably reached the girl in due course the next day. The defendant admitted that he wrote it.

The girl had testified that she informed Lloyd in August that she was pregnant, and that he had said they would get married before anybody found it out; they were going to be married before school began. She further testified that in the last of August he had told her that he would not marry her at all.

The letter contains endearing terms, but notoriously such terms accompany illicit relations, with or without marriage engagement. It begins with an apology for being away from her for so long; that he was obliged to go to St. Louis on account of a sick sister, and the matter was expensive to him because he had to pay the bills, and he supposed he would "be in the hole all winter." He then adds:

"Well, anyway I don't think that will spoil our plans, do you think so? . . . Hope not anyway."

He then expressed the hope that he would find some letters from her when he went to the shop and makes allusion to the illicit relations existing between them which she could easily understand.

The point made by the State on this letter is his expressed belief that the difficulties he had encountered would not "spoil our plans."

The letter fails to mention any rupture between them which she testified occurred the latter part of August. If there was such a rupture it had been patched up. The "plans" referred to, considering their relations, could hardly have referred to the engagement sworn to by her to get married before school should begin. If he should "be in the hole" all winter that plan could not be carried out.

He expressed hope that they would be together soon. That statement fails to show any reference to a marriage engagement, unless it referred to the agreement to which she testified that they were to get married early in order to conceal her condition.

It is remarkable that the mother knew nothing of her engagement. She started to say in her evidence that the girl told her at the time she discovered her pregnancy that she was engaged, and that was excluded as hearsay. The young man's attentions to the girl were not sufficiently marked for the mother to notice them. The girl testified that after the engagement she started a "hope chest," but the mother seemed to know nothing about that. The girl's association with the defendant, according to her own story, were clandestine, not intended to be known by her mother and step-father. The mother knew nothing of the present of the fountain pen, neither did anyone else. Although she knew of her daughter's condition in August she did nothing about it until the middle of November. Then for the first time she went to see defendant about it, and at the time said nothing whatever to him about a marriage engagement. The stepfather said nothing to him about an engagement to marry. If the daughter had reported anything of that kind in explaining the situation that would have been the first thing in their minds to bring to his attention. Her affidavit exonerating the defendant on the condition that he would pay her hospital expenses appeared to be a complete settlement. The inference is that she was to drop her charge and he was to pay those expenses, which would not be incurred until some months later, and long after the trial. If her story was true that arrangement was still binding upon him at the time of the trial.

If there had been such an arrangement we must assume that Mr. Alexander, a reputable attorney, knew about it, and would have insisted upon his client complying with it, which could not be done until those hospital expenses had been incurred. There is not a word to show that defendant repudiated that arrangement if such an one were made. All these things tend to show not only that the girl was not corroborated, but also in some important matters she is discredited. Possibly she was imposed upon through weakness of her resistance. The judge must have been impressed with the feebleness

1190

of the State's case; evidently thought the punishment which the jury, through sympathy with the girl, had inflicted, was unnecessarily severe and he reduced it half.

We think the evidence is lacking in the element of corroboration to justify a submission of that issue to the jury.

II. The defendant excepted to the ruling of the court in refusing to admit evidence offered by him to show acts of immorality and indiscreet conduct on the part of Ruby Leslie prior to the alleged seduction. Considerable discussion turns upon evidence of that character. Specific acts cannot be shown for the purpose of attacking the reputation of a person under consideration. The statute under which the defendant was charged, Section 3259, requires the female to be of "good repute." Reputation is not shown by specific acts.

But another feature of Section 3259 requires that, in order to constitute the offense, the defendant must "seduce or debauch" the female. That does not necessarily mean that she shall always have been of previous chaste character. But it does require that she shall have been at the time of the seduction honestly pursuing the path of virtue. That principle seems to have been understood by the court and evidence of specific instances was properly admitted. A number of witnesses for the defendant swore to acts of immorality on the part of Ruby Leslie, and the jury was properly instructed upon that issue. On a new trial the court should be careful to distinguish the purpose for which such evidence is offered, and it should be confined to the time prior to and near the alleged offense.

III. Appellant complains of the refusal of instructions asked by him. He was entitled to any instruction if properly phrased which was the converse of any instruction given for the State. It is probable that some of the instructions asked by defendant should have been given on that ground, while many other instructions asked by defendant are too extreme in their statements, and require a finding of facts not necessary in determining defendant's guilt.

Complaint also is made of the attitude of the court as unfair to the defendant. The court did exhibit impatience in some instances, but from this record it is impossible for us to determine whether he transcended the bounds of propriety in that respect. Those, with other alleged errors, we find it unnecessary to consider, for they probably will not recur on another trial.

IV. The affidavit said to have been made by Ruby Leslie, charging Theodore Cargle with rape, was introduced in evidence, but is

not copied in the record. She admitted on cross-examination that it was false. It was incompetent and her admissions in regard to it were incompetent on any theory, since the occurrence mentioned was four months after the alleged seduction. Nor was her statement that the affidavit was false admissible to impeach her testimony. A witness may be impeached by showing he or she has been convicted of a crime, but *no* law authorizes a witness to be impeached by compelling him to incriminate himself. [Page v. Payne, 293 Mo. 1. c. 621.] This was an attempt to have Ruby Leslie confess that she had made false affidavit—a criminal offense. The error was against the State and the defendant of course cannot complain, but on another trial the court should exclude the affidavit and should not permit a similar cross-examination of the prosecuting witness about it.

The judgment is reversed and the cause remanded. All concur.