THE STATE v. ROY PERKINS, Appellant.—116 S. W. (2d) 80.

Division Two, May 3, 1938.

*G. Derk Green* for appellant.

*Roy McKittrick*, Attorney General, and *Aubrey R. Hammett, Jr.*, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant was charged by information with stealing in the nighttime 165 white rock spring chickens of the value of $50 belonging to Irvan Vasser from the premises upon which the latter's dwelling house was situate. On change of venue from Chariton County the cause was tried to a jury in Linn County and the accused was convicted with punishment fixed at two years' imprisonment in the penitentiary. He has filed no brief in this court. His motion for new trial in the circuit court contained seventeen assignments of error. We shall consider such of them as come within the requirements of the new trial statute.

I. Five of the assignments are directed to the proposition that the evidence was insufficient to support the verdict. Another complains of the overruling of appellant's objection to the introduction of any evidence, made at the beginning of the trial on the ground that the information was indefinite and duplicitous in that it charged two different and separate offenses. We discuss these assignments together because it is necessary to determine what the charge was before deciding whether there was sufficient evidence to support it.

As stated, the information charged that the appellant stole in the nighttime chickens worth $50 belonging to Irvan Vasser from the premises whereon his dwelling house was situate. This was sufficient to bring the case within either of two statutes: Section 4064, Revised Statutes 1929 (Mo. Stat. Ann., p. 2865), making it grand larceny to steal the personal property of another of the value of $30 or more; and Section 4066, Revised Statutes 1929 (Mo. Stat. Ann., p. 2871), making it grand larceny to steal in the nighttime domestic fowls of any value from the premises upon which the dwelling house of another is situate. The record does not show that the court ruled upon appellant's objection to the introduction of any evidence made at the beginning of the trial, but it does appear that at the close of the State's case in chief appellant moved the court to require the State to elect upon which charge in the information it would proceed. That motion was sustained and the prosecutor announced: "the State elects to proceed on the charge of grand larceny of domestic fowls." He did not say larceny of domestic fowls *in the nighttime*. We should, therefore, have understood the an-

nouncement to mean the charge would rest on the general grand larceny statute (Sec. 4064, supra) whereunder the State made a stronger showing in our opinion. But we find that at the close of the case the court did not instruct on grand larceny under Section 4064, but only on grand larceny of domestic fowls in the nighttime under Section 4066, and on petit larceny. So we shall review the evidence with reference to its probative value on that theory.

To sustain a conviction under Section 4066, supra, it must appear that the larceny was committed "in the nighttime." We do not find that expression has been defined by the statutes or decisions of this State. But at common law in proof of the crime of burglary it was essential to show the breaking or entering, or both, were committed in the nighttime; and this was held to mean "that period between sunset and sunrise during which there is not daylight enough by which to discern a man's face." [9 C. J., sec. 28, p. 1020; 4 R. C. L., sec. 13, p. 425.] Other definitions in varying circumstances have been made by statute or judicial construction. The rule is often followed that nighttime begins thirty minutes after sunset and ends thirty minutes before sunrise. Words and Phrases, "Night—Nighttime," First, Second, Third and Fourth Series. And it is a matter of common knowledge that ordinarily one can see and recognize objects and persons about that long after sunset or before sunrise. In the absence of a different statutory definition we adopt and apply the common-law definition here.

There is ample evidence that the appellant with two other men committed the larceny. The prosecuting witness, Vasser, owned some 164 white rock chickens of an average weight of from 1-1/2 to 2 pounds, which he said were worth about $50. He kept them in a brooder house on the premises where his dwelling house was located. The former was about 135 yards distant from the latter, but within view. The chickens went to roost the night of July 9, 1935, at the usual time. The next morning all were gone. There were footprints of several persons leading past places where the wire fence had been cut to the public road. At the side of the road automobile tire prints showed where two cars had stood and white chicken feathers were scattered around. One car had two new tires, one smooth tire, and one about half worn, which combination made distinctive markings that showed clearly in the parts of the road outside the beaten track after the heavy dew of the night before. These tracks were traced to the home of John Russell Moritz and also doubled toward appellant's home in the same neighborhood. Late the same day when appellant was arrested at his home the tires on his car were found to correspond with the tire tracks aforesaid.

About five o'clock in the evening 131 of the chickens weighing 250 pounds, an average of 1.9 pounds each, were found at the poul-

try house of Emmet Vanderbeck in Huntsville, Randolph County, some twenty-two miles from appellant's home. They had been brought there that morning about six-thirty or seven o'clock by three strangers in two cars, a roadster and a coupe. Some of the chickens were tied up and some in sacks. Several of them were dead from smothering. The three men who brought them were in a hurry, demanded cash, and were paid $27 and some cents at 11 cents per pound (which would be $27.50). The chickens were positively identified by Vasser and his wife. In size, weight and color they met the description of his. They had grease spots on them such as his chickens had got from ranging in weeds where farm machinery had been, and one "runt" chicken was easily recognizable. When they were taken back to the Vasser home they appeared to be familiar with the premises, went to drink at the usual place, readily entered the brooder house to roost, and were unafraid of the house dog. The poultry dealer, Vanderbeck, and his helper positively identified appellant and two other men as the persons who had sold the chickens to him. And two State's witnesses, Gray Wright and John Fitzgerald, testified that about five o'clock the morning of July 10 they saw appellant and John Russell Moritz in one car and appellant's son in another, both Model A Fords with turtle backs, driving east along the road leading to Vasser's home, and about three miles distant therefrom. This evidence was sufficient to convict the appellant of grand larceny.

But the important question as to whether the chickens were stolen "in the nighttime" still remains to be determined. The prosecuting witness, Vasser, testified they went into the brooder house to roost that evening and he shut the door. He did his chores, which took an hour, finishing about sundown. Then he ate supper. The brooder house was in sight of his dwelling and nothing occurred to attract his attention that night. It is fair to say from these circumstances that the chickens were not stolen *before* nighttime on July 9.

He said he discovered the chickens were gone about five-thirty the next morning when it was "coming daylight." It was not light when he got up. He made a fire in the cook stove and fed and harnessed the horse. It took eight or ten minutes to do this latter. While he was at the barn it was daybreak and he could see. The barn was about fifty yards from the brooder house. Perhaps fifteen minutes later he missed the chickens. Nothing occurred after he got up indicating the chickens were being stolen. Further on in his testimony he said about fifteen or twenty minutes elapsed while he was harnessing his horse, doing the chores, discovering the chickens were missing, going back to the house and reporting to his wife, and then returning to the chicken house and following the footprints out to the road. His wife called her father and the father got Mr. Widmer, deputy sheriff, to come out to the place. That took fifteen

or twenty minutes. Mr. Widmer testified that Vasser's father-in-law came for him about six-fifteen A. M. On redirect examination Vasser again stated it was still dark when he got up, and was turning light when he was out at the barn doing his chores.

We take judicial notice that the sun rose that morning at 4:31 A. M. If daylight began 30 minutes earlier it would be at 4 o'clock. As already stated the State's witnesses Gray Wright and John Fitzgerald said they saw the appellant, his son and Moritz pass along the road *toward* Vasser's house at five A. M. It was then broad daylight. Wright was at his barn 100 feet from the road. Figuring Mr. Vasser's estimates of elapsed time it seems he must have arisen about five o'clock. All this indicates the chickens were stolen after daylight. But he testified twice that it was not light but dark, when he got up. This is better evidence of the fact than his estimates of time. So we have concluded that his testimony furnishes substantial evidence the chickens were stolen in the nighttime. We hold, therefore, that the State made a prima facie showing on this issue, and consequently on the whole case, though the question is close.

The appellant's defense was an alibi. He testified, and in this was corroborated by his sons Floyd and Kenneth Perkins, his daughters Velma and Lucile Perkins, and his wife, that he was at home all night the night of July 9 from sundown on, and that he and his son Floyd and John Russell Moritz started out the next morning between 5 and 6 o'clock on a trip to buy soy beans. They were gone until about 8 or 8:30 A. M. Moritz did not testify. A witness named Chester Shatto said the appellant, his son and Moritz called at his house about 7 o'clock on the morning of July 10 looking for soy beans. This witness was a nephew of the appellant's wife. A neighbor John Ehrhardt testified that the appellant had plowed five or six acres in preparation for planting soy beans before he was arrested on July 10; and another neighbor, J. C. Phillips saw the appellant during the noon hour of July 10 when he was watering his team and eating his dinner, while apparently engaged in farm work.

The appellant and the five members of his family above mentioned also testified that the son Kenneth Perkins was sick of diabetes and blood poisoning the night of July 9 and that two of his friends, William Tippett and Raymond McCollum sat up with him all that night. Tippett and McCollum corroborated that story and said the appellant was home all night. The appellant and his son Floyd Perkins denied stealing Vasser's chickens and denied that they were the persons who sold them early the morning of July 10 to the poultry dealer Vanderbeck.

II. Another assignment is that the court erred in overruling appellant's application for a continuance. It alleged, among other things, that more than three weeks theretofore he was seriously in-

jured about his head, face and neck, and received a large cut and breakage of the flesh and bones about the upper lip and cheeks and throughout the region of his mouth; that as a result thereof he was confined to his home and under the care of a physician for a long period of time and almost to the date of trial; that he then was and had been unable to contact witnesses, interview his attorney and make plans for his defense; that he was wholly unprepared to offer proof in his behalf, as he otherwise would have been able to do. The application was not supported by the certificate or affidavit of any physician, or anyone else; and the appellant testified in his own behalf and presented ten witnesses. The trial court was in a better position to know the facts. We cannot question its ruling on this ground for a continuance. [State v. Walters (Mo. Div. 2), 29 S. W. (2d) 89, 90; State v. Jasper, 324 Mo. 668, 24 S. W. (2d) 161.]

The application further set up the absence of two material witnesses, Mr. and Mrs. William Fry, alleged on belief to be residents of Chariton County. It recited that appellant had caused a subpoena to be issued for them in that county on October 16, two weeks before the trial, "because he believed that they lived there." The subpoena was delivered to the sheriff the next day and never served. As to the facts, the application alleged the witnesses were at appellant's home on the morning of July 9 about sunup or shortly prior thereto in daylight; that they talked to appellant for 15 or 20 minutes and saw his Ford roadster; that they observed the interior of both the front and rear compartments, and noted he was cleaning them out and removing the tools in preparation for hauling beans; that appellant drove away in the car, and there were no chickens in it.

The absence of still another material witness was alleged, Marvin Drew. A subpoena for him was delivered to the sheriff of Chariton County on October 17, and another one later, but neither was ever served though that was the county of the witness's residence, "so far as known to defendant." The application stated Drew was arrested with appellant and others on the evening of July 9, and taken to the jail at Huntsville where they were viewed by the produce man, Vanderbeck, and his helper, Turchie; that the latter said they could not identify the appellant as the man who had sold chickens to them or been present at such a transaction that morning or any other day. The application further alleged that appellant had good reason to believe and did believe he would be able to procure the attendance and testimony of all these witnesses at the next term of court.

It has been said so often the granting or refusal of a continuance because of the absence of witnesses rests largely within the discretion of the trial court, that it is hardly necessary to repeat it. [See State v. Naylor, 328 Mo. 335, 341, 40 S. W. (2d) 1079, 1082; State v. Wil-

son (Mo. Div. 2), 242 S. W. 886.] Especially should this be true with nomadic or so-called "mystery" witnesses whose places of residence were unknown except in a vague way on information and belief, as the application here discloses. The subpoenas were issued about two weeks before the trial but the witnesses were not found; at least the subpoenas were never served. It seems due diligence would have enabled the appellant to ascertain their whereabouts within that time, or to give the court better reasons for his inability to locate them, than are stated in the application. This assignment is overruled.

III. The next assignment in the motion for new trial is probably too general and indefinite to comply with the statute, Section 3735, Revised Statutes 1929 (Mo. Stat. Ann., p. 3275). We set it out:

"The court erred in admitting illegal and incompetent testimony about conversations with defendant and statements made by him; about conversations with witness Floyd Perkins and statements made by him; about conversations with witnesses Raymond McCollum and William Tippett and statements made by them; about identification of chickens by witnesses for the state; about the tracks found in the roadway by witnesses for the state; about the ownership of said chickens; about the following of tracks to the house of John Russell Moritz from the scene of the alleged theft of chickens; about identification of this defendant by witnesses for the state as being the man who sold chickens at Huntsville; about defendant being seen in company with John Russell Moritz; about the witness Floyd Perkins running around with said John Russell Moritz."

As a matter of indulgence we will pass on the assignment so far as we can determine what it refers to; but may add, parenthetically, that it furnishes an illustration of the wisdom of the statutory requirement that new trial assignments in a criminal case be specific— at least where the appealing defendant dumps the whole record on this court without a brief explaining what errors he relies on, as he may do under another statute (Sec. 3760, R. S. 1929, Mo. Stat. Ann., p. 3298). It is said one purpose of the new trial statute is to prevent the lower court from being "ambushed." But if vague assignments mislead the judge who presided over the trial, knows all that occurred, and is in a position to ask counsel to elaborate their assignments in arguing the motion, how much more should it be true of appellate courts, which are uninformed except from the cold record, and are denied the benefit of a brief from the appealing party.

The first item in the assignment complains of error in the admission of illegal and incompetent testimony "about conversations with defendant and statements made by him." As near as we can tell this refers to the following incident. On direct examination appellant told about being taken to the Huntsville jail after his arrest but did not

testify concerning any questions asked him there, or about any answers or statements he made. On cross-examination the prosecutor inquired whether on that occasion the officers asked him where he had been that day (July 10) and if he did not reply he had been at home all day and had not left the place. Appellant's counsel objected that the question was not within the scope of the direct examination of the defendant, but the court let the question stand on the theory that it laid a basis for impeachment. The appellant replied that he did not remember if the question was asked, but if it was he would not have answered it that way. On rebuttal the State proved by two deputy sheriffs that the appellant did say at the jail he had been home all day and did not leave his place except to plow.

We can see no merit in this contention. Appellant's theory seems to have been that he could not be cross-examined about conversations at the jail because he had not testified on that subject in his direct examination. But he overlooked another part of his testimony. The State had proven by witnesses Wright and Fitzgerald that appellant passed the Vasser home about five A. M., on July 10. Appellant countered this in his direct examination by admitting he did go by the Vasser farm that morning but put the trip an hour later, saying he was away from home between six and eight A. M. trying to buy soy beans. Obviously the State could ask him on cross-examination if he had not told the officers at the jail a different story, viz., that he had not left his farm that day. And when he virtually denied it, the State had the undoubted right to impeach him. The statute, Section 3692, Revised Statutes 1929 (Mo. Stat. Ann., p. 3242), says a testifying defendant in a criminal case "may be contradicted and impeached as any other witness in the case." If a foundation was necessary, it had been laid. [State v. Martin (Mo. Div. 2), 56 S. W. (2d) 137, 140 (11); State v. Anderson, 126 Mo. 542, 546, 29 S. W. 576; State v. Kennade, 121 Mo. 405, 413, 414, 26 S. W. 347, 349; State v. Avery, 113 Mo. 475, 500, 21 S. W. 193, 199.]

Similar complaint is made of the admission of testimony concerning conversations with the witnesses Floyd Perkins, Raymond McCollum and William Tippett. As regards Floyd Perkins and McCollum, the record shows these two witnesses on direct examination testified to certain facts, and on cross-examination were asked if they had not made specified extra-judicial statements to the contrary. On their denial or equivocation the State proved the contradictory statements in rebuttal. This was proper. We find in the record no impeachment of the witness Tippett by proof of contradictory statements. Neither is there anything to justify the other general complaints in this assignment. It is overruled.

IV. The twelfth assignment in the motion is that the court "erred in refusing to admit evidence offered by defendant as to the reputation of witnesses Turchie and Vanderbeck for the State, and affecting their reputation and standing." The appellant did not offer any evidence that the reputation of these witnesses for truth and veracity was bad; but in cross-examining them sought to elicit certain admissions derogatory of their characters. So we conclude the assignment attempts to invoke the rule stated in many cases that: "When a witness is cross-examined, he may . . . be asked any questions which tend to test his accuracy, veracity or credibility, or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge." [State v. Sherry (Mo. Div. 2), 64 S. W. (2d) 238, 240 (11); State v. Nasello, 325 Mo. 442, 464, 465, 30 S. W. (2d) 132, 140; Wendling v. Bowden, 252 Mo. 647, 695, 698, 161 S. W. 774, 788.]

Along this line we find the following in the cross-examination of the witness Vanderbeck, the poultry dealer:

"Q. Don't you recall one time you were down there and you had some chickens in sacks hid out behind your place, and they investigated that a day or two, and you never would claim them? A. No. No chickens found there.

"By Mr. Lamkin: I object to that line of cross-examination because it is not based on any facts that can be shown in evidence, and its only purpose is to prejudice and inflame the jury and not proper foundation for impeaching the credibility of this witness.

"By the Court: Maybe not. Sustained (exception saved)."

Then counsel sought to ask the witness several questions about whether the officers had not frequently been to his place of business looking for stolen chickens, and the question was excluded over appellant's objection and exception; but thereafter the witness was permitted to testify that every once in a while the officers asked him to watch for stolen chickens, and came to his place inquiring about them.

In the cross-examination of Nello Turchie, employee of the witness Vanderbeck at the poultry house in Huntsville, the following occurred:

"Q. These officers had been down there before? A. No, sir.

"Q. You had never seen officers down there before? A. No, sir.

"By Mr. Lamkin: I object to that line of cross-examination for the reason it wouldn't tend to prove or disprove any issue in this case, and it is an attempt to prejudice and inflame the jury and could serve no purpose whatever, and is not the proper basis for impeachment of this witness.

"By Mr. Green: We could certainly show this witness' character and standing in the community, if we can show the trouble he had been in different. . . . "

Counsel was interrupted by an objection and explained, out of the hearing of the jury: "We want to show by this witness that he is a person of bad character and reputation, and that his reputation for truth and veracity in that community is bad." And the Court said: "Propound that question and qualify him on his reputation, if you want, but don't pursue the line of inquiry about officers investigating the place theretofore. That's a line I am excluding. Go ahead and qualify him." (Exception saved.) Appellant did not avail himself of that opportunity and presented no impeaching character witnesses.

We think appellant's counsel had the right, under the rule referred to and quoted, to ask the witness Vanderbeck whether he had knowingly received or concealed stolen chickens; and if the first question set out above was tantamount to that it was proper, since the witness did not claim his constitutional right to immunity from self-incrimination. But the witness did answer the question in the negative, and the appellant was bound by that answer. [State v. Bagby, 338 Mo. 951, 964, 93 S. W. (2d) 241, 248 (11).] So the error was harmless, if it was error for the court to sustain the objection to the question.

The questions asked the witnesses Vanderbeck and Turchie about whether the officers had not frequently been to their place of business looking for stolen chickens—in other words, whether they were not under suspicion—were improper, and the court did not commit error in sustaining objections thereto. They were of the same nature as questions about whether a witness has been charged with a crime or arrested (without a conviction) for an offense; and it is well settled that a witness cannot be impeached in that manner. [Wendling v. Bowden, supra, 252 Mo. 1. c. 697, 161 S. W. 1. c. 789; State v. Pine, 332 Mo. 314, 320, 321, 57 S. W. (2d) 1087, 1089, 1090 (6).]

In the cross-examination of the State's witness Widmer, deputy sheriff, referring to the poultry house of Vanderbeck at Huntsville, this question was asked, and objection and ruling made:

"Q. And you heard that was a place where they frequently bought stolen chickens, and found them there?

"By Mr. Lamkin: I object to that. I am going to ask the court to reprimand counsel. The court sustained my objection to that at least four times.

"By the Court: Sustained. Don't do that again, I admonish you, sir. (Exception saved.)"

In so ruling, the trial court was right, for the reason stated in the preceding paragraph and also because a witness cannot be impeached

by independent proof of specific acts. [Seymour v. Farrell, 51 Mo. 95, 97; State v. Nanna, 322 Mo. 1180, 1190, 18 S. W. (2d) 67, 71.] This can be done only on cross-examination of the witness assailed. [State v. Williams, 335 Mo. 234, 240, 71 S. W. (2d) 732, 735 (8).]

V. The last assignment preserved for review complains of the refusal of appellant's Instruction C on alibi. This subject was fully covered by Instruction No. 8, tendered by appellant.

We find no reversible error, and the judgment is affirmed. All concur.